**Reverse and Render and Memorandum Opinion filed February 6, 2025**



In The

# Court of Appeals for the Fifteenth District

---

### NO. 15-24-00030-CV

---

**TEXAS REAL ESTATE COMMISSION, Appellant**

**V.**

**MARLA NUNALLY KAUFMAN HOMES, LLC, Appellee**

---

**On Appeal from the 192nd District Court**
**Dallas County, Texas**
**Trial Court Cause No. DC-19-17301**

---

### MEMORANDUM OPINION

Appellant Texas Real Estate Commission (TREC) challenges the trial court's order directing payment to Appellee Marla Nunally Kaufman Homes, LLC (Kaufman Homes) on the basis that its damages incurred are not eligible for reimbursement from the Texas Real Estate Recovery Trust Account (the Fund). *See* Tex. Occ. Code § 1101.602. Kaufman Homes obtained judgments against license holders Round Up Realty and Stephani Hardy for damages suffered as a result of mismanaged renovations. Unable to recover from the defendants, Kaufman Homes

then applied to the court for, and was granted, payment from the Fund. *Id.* Because managing renovations is neither "real estate brokerage," *id.* § 1101.004, nor conduct that "requires a license," *id.* § 1101.602, Kaufman Homes' damages are not eligible for reimbursement from the Fund. We reverse and render judgment denying Kaufman Homes' application for reimbursement.

## BACKGROUND

The Texas Occupations Code requires TREC to maintain the Fund "to reimburse aggrieved persons who suffer actual damages caused by an act described" in Section 1101.602. Tex. Occ. Code § 1101.601. It is not enough to show that the holder of a real estate license committed fraud or unscrupulous behavior, however. Chapter 1101 of the Texas Occupations Code sets out specific statutory criteria that that an aggrieved individual must demonstrate in order to be entitled to reimbursement. *See id.* § 1101.602. Those criteria are at issue here.

### *The Process for Obtaining Payment from the Fund*

Subchapter M of Chapter 1101 sets out the process for obtaining payment from the Fund: "an aggrieved person who obtains a court judgment against a license or certificate holder for an act described by Section 1101.602 may, after final judgment is entered, execution returned *nulla bona*, and a judgment lien perfected, file a verified claim in the court that entered the judgment." *Id.* § 1101.606(a). Then, following the "20th day after the date the aggrieved person gives written notice of the claim to the Commission and the judgment debtor," the aggrieved person "may apply to the court that entered the judgment for an order for payment from the trust account." *Id.* § 1101.606(b).

If the matter is not settled, the court holds a hearing where the aggrieved person bears the burden of showing that "the judgment is based on facts allowing recovery" under subchapter M. *Id.* § 1101.607. TREC's role at the hearing is to act

to "ensure compliance with the requirements for recovery" or to "protect the trust account from spurious or unjust claims." *Id.* § 1101.608(b)(1)–(2).

When the hearing concludes, the court "shall order" TREC to pay from the Fund "the amount the court finds payable on the claim" if—but only if—the court is satisfied of the "truth of each matter that the aggrieved person is required to show under Section 1101.607," and that the "aggrieved person has satisfied the requirement of Sections 1101.606 and 1101.607." *Id.* § 1101.609.

### *The Home Flipping Arrangement*

This case arises out of a home flipping arrangement gone awry between Kaufman Homes, Round Up Realty (Round Up) and Round Up's owner Stephani Hardy (Hardy, and together with Round Up, Defendants). In its petition, Kaufman Homes pleaded that Hardy and Round Up Realty are both holders of real estate licenses. Pursuant to the arrangement, Kaufman Homes purchased properties in its own name and provided all the necessary capital to renovate those properties. In exchange, Round Up would act as a sales agent during the purchase, supervise renovations, and then list the properties for sale. The arrangement proceeded in three phases: (1) purchasing the properties, (2) renovating the properties, and (3) selling the properties. It is Round Up's conduct during the renovation phase that forms the basis for the dispute between the parties.

Kaufman Homes also pleaded that it paid Round Up to manage the renovations. As part of its management duties, Round Up was to hire contractors, supervise their work to ensure it was being completed in a timely and workmanlike manner, and then submit the bill to Kaufman Homes for payment. Round Up did in fact submit several bills to Kaufman Homes, which Kaufman Homes paid. Ultimately, Kaufman Homes discovered that some of the renovations it had paid for were either not done in a workmanlike manner, not done timely, or not done at all.

Kaufman Homes also discovered some of the money earmarked for renovations had ended up in Round Up's pockets as "kickbacks."

### *Kaufman Homes Wins Judgments Against Round Up and Hardy*

Kaufman Homes sued Round Up, Hardy, and certain contractors hired by Round Up for (1) fraud, (2) breach of fiduciary duty, and (3) negligent misrepresentation "in relation to [Round Up's] conduct in fraudulently or negligently approving fake draw requests for Kaufman Homes to pay, failing to supervise work being performed (or not) by the contractors and fraudulently taking kickbacks from the construction funds." Specifically, Kaufman Homes sought damages for:

(1)    funds paid for renovation work that was not performed;

(2)    the cost of redoing renovation work that was performed in a substandard manner;

(3)    the opportunity cost of capital that was tied up in the homes when renovation work was not performed in a timely manner;

(4)    funds paid to Round Up Realty for property management services; and

(5)    kickbacks received by Round Up Realty that Round Up Realty should instead have applied to reduce the cost of renovations.

The record reflects that Round Up defaulted without answering, and a default judgment was entered. Considering the "pleadings and official records on file in this cause and the evidence," the trial court awarded Kaufman Homes "compensatory damages of $983,209.29" and $14,982.00 in attorneys' fees, both at 6% post-judgment interest. Although the judgment is in the record, the record does not contain a transcript of the default judgment proceeding or any of the evidence presented at that hearing.

Hardy appeared but failed to defend against Kaufman Homes' motion for summary judgment. The trial court granted summary judgment against Hardy on all claims and awarded Kaufman Homes $983,209.29, along with post-judgment interest at a 6% rate. Although the summary judgment is in the record, the motion is not. Nor does the record contain any of the summary judgment evidence.

### *TREC Denies Kaufman Homes' Application for Payment from the Fund*

After writs of execution were returned *nulla bona* and the judgment liens against Round Up and Hardy recorded, Kaufman Homes filed an application for an order directing payment out of the Fund. TREC reviewed Kaufman Homes' application and determined that Kaufman Homes had not demonstrated it "suffered actual damages caused by conduct that requires a license." Tex. Occ. Code § 1101.602. Tex. Nor had the Defendants "engaged in real estate brokerage," because Section 1101.004 expressly excluded activities consisting "solely" of "constructing, remodeling, or repairing a home or other building" from that definition. *Id.* § 1101.004(b)(1).

TREC concluded that "the arrangement described in the original petition in the underlying suit was that 'Marla Nunally Kaufman Homes would put up the funds to acquire and renovate the homes, while Round Up Realty would handle the acquisition, renovation and sale of the homes.'" Because this conduct "focused on the defendants' role in the renovations of these properties." TREC reasoned that the "conduct described in the original petition is not conduct requiring a license under Chapter 1101, Occupations Code, [so] the claim is not eligible for payment from the Fund."

### *The District Court Issues an Order Directing Payment from the Fund*

Kaufman Homes and TREC each appeared at the hearing on the Kaufman

Homes' application in Dallas County district court. *Id.* § 1101.606(b). Neither side introduced evidence. Instead, TREC and Kaufman Homes made legal arguments about whether the judgment was eligible for reimbursement based on the facts described in the underlying petition.

Kaufman Homes argued that the facts were undisputed, and that it was entitled to payment from the Fund because the parties to the arrangement "weren't simply engaged in renovation, or construction, or building." They were "managing the properties, engaging with contractors, and then listing the properties for sale." According to Kaufman Homes, its harms were compensable by the Fund because the conduct forming the basis of its judgments was expressly covered in Section 1101.652(b)'s list of acts constituting grounds for discipline or revocation of a license. *See id.* § 1101.652(b).

TREC responded that the judgments were not eligible for reimbursement from the Fund because Defendants' conduct that gave rise to Kaufman Homes' damages did not require a real estate license. Rather, the Defendants' conduct was not eligible for payment from the Fund since a "person is not engaged in real estate brokerage . . . based solely on engaging in: constructing, remodeling, or repairing a home or other building." *Id.* § 1101.004(b)(1). According to TREC, the judgments compensated Kaufman Homes for damages solely sustained by the Defendants' conduct in constructing, remodeling, or repairing a home or other building, so they were not eligible for reimbursement from the Fund.

Following the hearing, the trial court granted Kaufman Homes' application, ordering TREC to "make payment from [the Fund] to [Kaufman Homes] in the total amount of $200,000, that being $100,000 maximum per license holder." This appeal followed.

## ANALYSIS

TREC argues that the trial court erred in ordering payment because Kaufman Homes' damages arose solely from Defendants' conduct of "constructing, remodeling, or repairing a home"—conduct which is expressly excluded from the statutory definition of "real estate brokerage" and therefore from Fund reimbursement as well. *Id.* § 1101.004(b)(1). TREC also asserts a sufficiency challenge, arguing that there is no evidence in the record that Kaufman Homes' damages arose from conduct that was real estate brokerage and eligible for reimbursement from the Fund.

Relying only on its pleadings against Round Up and Hardy, Kaufman Homes responds that the judgments are eligible for reimbursement because its damages did not arise "solely" from renovations. Kaufman Homes argues that the renovations—and the damages arising therefrom—should be treated as one inseparable component of its whole relationship with the Defendants which centered around the acquisition and sale of properties. In other words, because Round Up and Hardy assisted with the initial purchase of the properties and would have been responsible for selling the properties upon completion, they continued to act as Kaufman Homes' "brokers and sales agents" at the renovation stage.

### I.

The parties agree that this appeal requires the interpretation of various provisions of the Real Estate License Act, codified as chapter 1101 of the Texas Occupations Code. Statutory interpretation involves questions of law that we review de novo. *Aleman v. Tex. Med. Bd.*, 573 S.W.3d 796, 802 (Tex. 2019). Our primary objective is to effectuate the Legislature's intent, and we do this by giving meaning to "every word, clause, and sentence." *Sunstate Equip. Co. v. Hegar*, 601 S.W.3d 685, 689–90 (Tex. 2020). Our inquiry starts with the plain text of the statute, and unless defined otherwise, we apply the "common, ordinary meaning" of those words

unless doing so would lead to an absurd result. *Malouf v. State ex rels. Ellis*, 694 S.W.3d 712, 718 (Tex. 2024). We endeavor to construe the language in a way that does not render any of it meaningless, because "every word or phrase is presumed to have been intentionally used with a meaning and purpose." *Fort Worth Transp. Auth. v. Rodriguez*, 547 S.W.3d 830, 838 (Tex. 2018) (citation omitted).

We review the trial court's grant of the application "as if it were a nonjury trial in which no findings of fact or conclusions of law were filed or requested, implying all necessary findings and conclusions to support the order." *Wilson v. Bloys*, No. 03-05-00529-CV, 2006 WL 1649324, at \*2 (Tex. App.—Austin June 16, 2006, no pet.) (mem. op.). Evidence is legally insufficient when (1) the record discloses a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence conclusively establishes the opposite of a vital fact. *Bustamante v. Ponte*, 529 S.W.3d 447, 455–56 (Tex. 2017).

## II.

TREC first argues that the trial court erred in awarding payment because Kaufman Homes was required to prove that its damages were caused by the Defendants while they were "engaged in real estate brokerage." Tex. Occ. Code § 1101.652(b). TREC contends that Kaufman Homes' damages were caused solely by conduct consisting of constructing, remodeling, or repairing a home—conduct which is expressly excluded from the statutory definition of "real estate brokerage." *Id*. § 1101.004(b)(1). According to TREC, there is no evidence in the record that Kaufman Homes' damages arose as a result of conduct that constituted real estate brokerage and that required the use of a real estate license, so none of its damages are reimbursable from the Fund. We analyze TREC's issue first with respect to the

damages caused by Round Up and second with respect to the damages caused by Hardy.

## A.

TREC regulates real estate license holders and enforces the provisions of the Real Estate License Act. *Id.* § 1101.151. As part of its statutory mandate, TREC is charged with administering the Fund, which was created to provide an avenue of limited recourse for members of the public defrauded by unscrupulous brokers or sales agents who abuse the privileges of their licenses. *Henry S. Miller v. Treo Enter.*, 585 S.W.2d 674, 675–76 (Tex. 1979); *see generally* Tex. Occ. Code ch. 1101, subch. M.

The key provision here is Section 1101.602, which states that "[a]n aggrieved person is entitled to reimbursement from the [Fund] if a [license holder] engages in conduct that requires a license . . . and [as relevant here,] is described by Section 1101.652[(b)]." Tex. Occ. Code § 1101.602 ("Entitlement to Reimbursement"). Section 1101.652(b), in turn, lists dozens of acts that are grounds for suspending or revoking a license if the license holder commits them while "engaged in real estate brokerage." *Id.* § 1101.652(b).

Taken together, these two provisions limit the conduct that is reimbursable from the Fund in three ways. First, the aggrieved person must show that the damages were from "conduct that requires a license." Second, that conduct must be included in Section 1101.652's lengthy list of bad acts that can trigger discipline or loss of a license. Third, the conduct on the list must have been committed while the person or entity was "engaged in real estate brokerage." The Legislature's use of the word "requires" places a condition on what type of "conduct" qualifies for reimbursement—the only actions for which reimbursement may be granted are those for which a license is necessary.

9

TREC focuses its appeal on the definition of the phrase "while engaged in real estate brokerage." *Id.* § 1101.652(b). That term is defined in Section 1101.004, subject to exclusions. Relevant here, one exclusion is that "[a] person is not engaged in real estate brokerage, regardless of whether the person is licensed under this chapter, based solely on engaging in the following activities: constructing, remodeling, or repairing a home." *Id.* § 1101.004(b)(1). As such, conduct that is based solely on constructing, remodeling, or repairing a home cannot qualify for reimbursement from the Fund even if such conduct would otherwise be covered by Subsection 652(b)'s list.

TREC argues that Round Up's activity of managing renovations—the activity that ultimately damaged Kaufman Homes—is not "real estate brokerage" for purposes of Section 1101.652(b) due to the Legislature's express exclusion of "repairing a home" from the definition of "real estate brokerage." The word "renovate" is synonymous with "repair." Merriam-Webster's Dictionary defines "renovate" as to "restore to a former better state (as by cleaning, repairing, or rebuilding). *Renovate*, MERRIAM-WEBSTER'S DICTIONARY (11th ed. 2024), Merriam-Webster.com Dictionary, https://www.merriam-webster.com/dictionary/renovate (last accessed Dec. 7, 2024). Courts, too, have recognized that to renovate is to repair. *Martin v. WPP Properties, LLC*, No. 12-20-00243-CV, 2021 WL 2816411, at *3 (Tex. App.—Tyler June 30, 2021, pet. denied) (mem. op.) (quoting the 11th edition of Merriam-Webster's Collegiate Dictionary for the same definition); *see Montoya v. Nichirin-Flex, U.S.A., Inc.*, 417 S.W.3d 507, 512 (Tex. App.—El Paso 2013, no pet.) ("renovate—to restore to good condition; make new or as if new again; repair") (quoting Webster's New Universal Unabridged Dictionary (2003)). Accordingly, if Kaufman Homes' damages were caused solely by Round Up's engagement in the activity of repairing or remodeling

10

a home, then the judgment is not eligible for reimbursement from the Fund.

Kaufman Homes relied only on its pleadings to prove the nature of its damages caused by Round Up, who defaulted without answering.[1] Although the house-flipping arrangement between Kaufman Homes and Round Up contemplated that Round Up would purchase and sell homes on behalf of Kaufman Homes, the only facts that Kaufman Homes pleaded giving rise to liability concern Round Up's involvement in the act of renovating properties. Kaufman Homes pleaded that Round Up committed fraud by "approving [] the draw requests" from renovation contractors, and representing to Kaufman Homes that "the work had been performed" when it had not, thereby injuring Kaufman Homes when it paid the draw requests.

With respect to its breach of fiduciary duty claim, Kaufman Homes pleaded that "Round Up violated the duties of honesty and competence when it approved draw requests for payment by [Kaufman Homes] without first verifying that all work represented by each draw request had in fact been performed." Further, Round up "violated the duties of loyalty and honesty when it accepted kickbacks from the construction contractors, and when it tolerated and/or encouraged contractors to act contrary to the interests" of Kaufman Homes.

Finally, regarding the negligent misrepresentation claim, Kaufman Homes pleaded: "Round Up, acting by and through its principal Stephani Hardy, by approving the draw requests of the contractors, represented to Kaufman Homes that

---

[1] In the case of a no-answer default judgment, the defendant's failure to answer represents an admission of all facts properly set forth in the plaintiff's petition except for unliquidated damages. *See Dolgencorp v. Lerma*, 288 S.W.3d 922, 930 (Tex. 2009) (citation omitted). Because Kaufman Homes' damages as against Round Up were unliquidated, the trial court held a hearing to determine the amount of damages to award. Neither that record nor any evidence regarding damages was included in Kaufman Homes' application for payment from the Fund.

the renovation work presented in the draw requests of the contractors had been performed. [Round Up] made these representations in the course of its business as property manager for [Kaufman Homes]." Kaufman Homes "reasonably relied upon the representations contained in the draw request approvals when it paid the draw requests," which proximately caused its injury.

These allegations from Kaufman Homes' petition—the only potential evidence regarding damages before us—are all based entirely on Round Up's role in managing the renovations. Kaufman Homes did not plead facts showing damages resulting from any activity constituting "real estate brokerage," such as the sale, exchange, purchase or lease of real estate. Tex. Occ. Code § 1101.002(1). Because there is no other evidence supporting the nature of Kaufman Homes' damages, we are not able to substantiate Kaufman Homes' assertion that its damages arose as a result of anything other than mismanaged renovations when the evidence before us supports only that. *Id.* § 1101.607(1) (applicant must prove facts allowing for recovery); *City of Keller v. Wilson*, 168 S.W.3d 802, 810 (Tex. 2005) (no evidence of an essential fact is insufficient to support a judgment). As pleaded, its damages arise *solely* from mismanaged renovations. But managing renovations is not conduct that constitutes "real estate brokerage," so the judgment against Round Up is not eligible for reimbursement from the Fund.

Kaufman Homes makes four arguments for why it nevertheless was entitled to recovery from the Fund. First, Kaufman Homes acknowledges that its own pleaded allegations against Round Up are replete with the word "renovation." Nevertheless, Kaufman Homes argues that "frequency of the word 'renovate' is not disputed, but it is also not determinative." Rather, "the nature or purpose of the transaction was Kaufman Homes' purchase and intended sale of the properties, for which Round Up/Hardy intended to act as Kaufman Homes' agent for commissions

12

and brokerage fees. Round Up/Hardy's role in the renovation part of the transaction, and their misconduct, is an inextricable part of the underlying purpose of the entire transaction, which was the purchase and sale of properties on behalf of Kaufman Homes as agent and broker."

We disagree. It was not enough to prove that Defendants' conduct that damaged Kaufman Homes was simply part and parcel of an "entire transaction" that contemplated that Round Up would engage in some actions constituting real estate brokerage, such as the purchase and sale of properties on behalf of Kaufman Homes as agent and broker. Rather, Kaufman Homes had the burden of proving that the judgment against Round Up "was based on facts allowing recovery," which required proof that its damages arose from conduct that "require[d] a license" and did not consist solely of "engaging in the activity" of "constructing, remodeling, or repairing a home." Tex. Occ. Code §§ 1101.602, –004(b)(1). Even assuming that there were pleaded factual allegations that Kaufman Homes was injured by some conduct that did require a license or could have constituted real estate brokerage, Kaufman Homes offered no evidence to show what damages were caused by that conduct as opposed to the damages caused by Round Up's engagement in repair work. Even if Kaufman Homes anticipated that Round Up would eventually sell the properties on behalf of Kaufman Homes, its damages do not arise from that anticipated conduct.

Second, Kaufman Homes argues—without citing evidentiary support—that Round Up and Hardy "were not renovating the properties, nor did they engage the contractors on their own behalf." To the extent that Kaufman Homes now argues that Round Up was not involved at all in the renovations, that argument contradicts its own pleadings in the prior litigation, which constitute the only potential evidence to support the judgment. If Kaufman Homes is simply arguing that Round Up personnel did not personally swing a hammer or sheetrock a wall, that is immaterial.

13

As the pleadings indicate, home renovations involve teams of people, including managers, contractors, and workers. Round Up's management of renovations for Kaufman Homes—including "managing the money" on the transactional side of the process—would still qualify as engaging in the "activity" of repairing the home.

TREC responds that even if Kaufman Homes were correct that Round Up's role was merely to "manage money"—divorced from the context of the scenario in which the money is managed—Kaufman Homes still has not satisfied either the "conduct that requires a license" or "engaged in real estate brokerage" requirements. We agree. Nothing in Chapter 1101 states that merely "managing money" is conduct which "requires a license" for purposes of Section 1101.602. In fact, solely "managing . . . an investment in real estate," like managing renovations, is also specifically excluded from the definition of "real estate brokerage." Tex. Occ. Code § 1101.004(b)(2). The Defendants were not engaged in "real estate brokerage" "based solely" on their role managing the money in the parties' home flipping arrangement. *Id.*

Third, Kaufman Homes argues that Round Up's conduct fell within nine of the specific categories of the types of conduct expressly mentioned in Section 1101.652(b)'s list. For example, Kaufman Homes argued that it was damaged when Round Up acted "negligently or incompetently," *id*. § 1101.0652(b)(1), and when Round Up "engage[d] in conduct that is dishonest or in bad faith or that demonstrates untrustworthiness." *Id.* § 1101.0652(b)(2). But establishing damages arising from one of the 33 enumerated actions is not sufficient to establish entitlement to reimbursement from the Fund. Satisfying Section 1101.652(b) *also* requires proof that Round Up injured Kaufman Homes by committing such an action while engaged in "real estate brokerage," which, as discussed above, does not include managing renovations.

14

Finally, Kaufman Homes argues that Round Up's conduct that caused the damages need only "generally relate" to real estate brokerage. For support, Kaufman Homes cites dicta from *Texas Real Estate Commission v. Nagle:* "[g]enerally, the damages must relate to the broker's dishonest conduct." 767 S.W.2d 691, 693 (Tex. 1989). We decline to so hold—to do so would render the "requires a license" language subsequently added by the 84th Legislature entirely meaningless. Act of June 19, 2015, 84th Leg., R.S., ch. 1158, § 56, 2015 Tex. Gen. Laws 3914 (codified at Tex. Occ. Code § 1101.602). *See Fort Worth Transp*., 547 S.W.3d at 838 ("We read statutes contextually to give effect to every word, clause, and sentence . . . .").

When *Nagle* issued, in 1989, the relevant law permitted the Fund to be used to reimburse "aggrieved persons who suffer actual damages by reason of certain acts committed by a duly licensed real estate inspector. . . ." *See* Act of June 10, 1985, 69th Leg., R.S., ch. 404, § 1, 1985 Tex. Gen. Laws 1491, 1492 (repealed by Act of June 17, 2001, 77th Leg., R.S., ch. 1421, § 2, 2001 Tex. Gen. Laws 4658, 4678). Even years later, the 77th Legislature did not expressly limit reimbursement from the Fund to "conduct that requires a license" when it codified the Real Estate License Act in 2003. Act of June 17, 2001, 77th Leg., R.S., ch. 1421, § 2, 2001 Tex. Gen. Laws 4658, 4678 ("An aggrieved person is entitled to reimbursement from the trust account if a [license holder] engages in conduct described by Section 1101.652(a)(3) or (b)"). The 84th Legislature deliberately added the requirement that the license holder be engaged in conduct that "requires a license" to Section 1101.602 in 2015. Act of June 19, 2015, 84th Leg., R.S., ch. 1158, § 56 2015 Tex. Gen. Laws 3914.

Kaufman Homes also urges us to follow the rationale of *Texas Real Estate Commission v. Rodriguez*, from the Fourth Court of Appeals. No. 04-09-00681-CV, 2010 WL 2403721 (Tex. App.—San Antonio June 16, 2010, pet. denied). In that case, two land owners procured a payment from the Fund for damages incurred when

they hired a real estate agent to arrange for a builder to build a home on the owners' plot. The agent arranged for Chavez Homes to act as builder, negotiated the price to build the house, arranged for financing, and handled the closing. Later, the land owners prevailed in a lawsuit against the realtor for damages from the use of unlicensed subcontractors and the failure to build in accordance with plans and specifications. *Id*. at \*1. The trial court awarded the owners payment from the Fund, and TREC appealed. *Id.* The appeal turned on whether the owners had satisfied the statutory requirement of proving that their damages were caused by "an act that constitutes a violation of [the Real Estate License Act] if the judgment debtor was at the time of the violation a licensed real estate broker." *Id.* (quoting former Tex. Civ. Stat. art. 6573a, § 8(a)) (repealed by Acts of 2001, 77th Leg., R.S., ch. 1421, § 13(a)). The court found that the broker was acting as a real estate broker because, even though the owners did not pay her, she was acting in exchange for valuable consideration from the builder. *Rodriguez*, 2010 WL 2403721 at \*3.

Like *Nagle*, *Rodriguez* is inapposite because it does not interpret the current law that governs our analysis today. The *Rodriguez* court was interpreting a prior version of the Real Estate License Act (the law in effect at the time of the underlying lawsuit). *Id.*, at \*1, n. 1. But it was not until 2015 that the Legislature (1) conditioned Fund reimbursement on proof that the conduct "requires a license" and be committed while "engaged in real estate brokerage," and (2) expressly excluded "constructing, remodeling, or repairing a home" from the definition of "real estate brokerage." Act of June 19, 2015, 84th Leg., R.S., ch. 1158, §§ 8, 60 2015 Tex. Gen. Laws 3901, 3914 (codified at Tex. Occ. Code § 1101.602, –.004(b)(1)).

Rather, this case is like *Vallakalil v. Texas Real Estate Commission*, No. 05-18-00702-CV, 2019 WL 2266663 (Tex. App.–Dallas May 24, 2019, pet. denied). In *Vallakalil*, two land owners met a real estate agent who represented to them that he

had experience in planning, designing, financing and constructing homes. *Id.* at *1. Relying on this representation, the owners hired the agent's company to construct a new house. *Id.* After the project experienced numerous "construction mistakes [and] delays," the owners obtained a default judgment against the agent for his "failure and refusal to perform [his] obligation to complete the construction contract." *Id.* at *2. At the hearing on their application for reimbursement from the Fund, the owners argued that the agent undertook all those activities in his capacity as their real estate agent. *Id.*

But the sole virtue of having a real estate license did not mean that he was acting as their real estate agent, *i.e.*, using the privileges of his license in overseeing the construction. *Id.* at *3. The trial court denied the owners' application because in managing construction, the realtor had not acted in any capacity as a broker. *Id.* at *2. In affirming, the Fifth Court of Appeals noted that the owners' pleadings, which alleged damages arising *only* from improper construction, contained "no allegations and no evidence to support a claim that [the agent] ever acted as a real estate broker in any of his dealings with the land owners." *Id.* at *3.

We find the Fifth Court of Appeals' rationale in *Vallakalil* instructive here, where the pleadings similarly assert that Kaufman Homes' damages arose *only* as a result of mismanaged renovations. Kaufman Homes' damages for the mismanaged renovations are not eligible for reimbursement from the Fund because those damages did not occur while Round Up was engaged in real estate brokerage, nor was Round Up's conduct in managing the renovations such that required a license. Consequently, we hold that the trial court erred in entering an order directing payment from the Fund for Kaufman Homes' judgment against Round Up.

## B.

Kaufman Homes made the same allegations against Hardy that it made against

17

Round Up, relying only on its pleadings from the prior litigation. For the reasons explained in Part II.A, the pleaded allegations cannot support an award from the Fund as a matter of law.

Furthermore, while Round-Up's no-answer default admitted all facts properly pleaded in the petition except for unliquidated damages, Hardy's post-answer default required Kaufman Homes to prove all aspects of its claim. *Dolgencorp*, 288 S.W.3d at 930. Kaufman Homes' case against Hardy was decided on summary judgment, but the only evidence presented by Kaufman Homes in support of its application was its petition. Kaufman Homes' petition cannot constitute evidence supporting an application for payment from the Fund as to the judgment against Hardy. A party's own pleadings do not constitute summary judgment evidence in its favor, even if they are sworn or verified. *Laidlaw Waste Sys. (Dallas), Inc. v. City of Wilmer*, 904 S.W.2d 656, 660 (Tex.1995); *see Regency Field Services, LLC v. Swift Energy Operating, LLC,* 622 S.W.3d 807, 819 (Tex. 2021) ("Clearly, a party cannot rely on its *own* pleaded allegations as evidence of facts to support its summary-judgment motion….").

The record here does not contain the summary judgment motion or the evidence that Kaufman Homes presumably relied on in support of its summary judgment motion. As such, there is no competent evidence to show what type of conduct formed the basis of the judgment against Hardy. Without such evidence, Kaufman Homes cannot prove that the "judgment is based on facts allowing recovery" under subchapter M of Texas Occupational Code Chapter 1101. Tex. Occ. Code § 1101.607. Accordingly, we reverse the judgment awarding reimbursement of the damages attributable to Hardy's conduct.

## CONCLUSION

We reverse the trial court's order directing TREC to reimburse Kaufman

18

Homes from the Fund and render judgment that Kaufman Homes' application for reimbursement is denied.

/s/ April Farris
April Farris
Justice

Before Chief Justice Brister and Justices Field and Farris.